## City of Philadelphia Petition

157

*F. F. Truscott*, city solicitor, for petitioner.

*J. S. Clark* and *Morris M. Pickholtz*, for city controller, contra.

SMITH, P. J., May 7, 1951.—This matter comes before the court on the petition of the City of Philadelphia to carry into effect the provisions of section 8 of article IX of the Constitution of Pennsylvania, as amended, for the purpose of having determined the amount of debt of the city which may be deducted from its indebtedness in ascertaining the borrowing capacity of the city. The petition is drawn in accordance with the Act of May 21, 1921, P. L. 1054, 53 PS §6757 et seq., which provides, inter alia:

"Whenever the city of Philadelphia shall have incurred or is about to incur any debt or debts for, and the proceeds thereof shall have been or are about to be invested in, any public improvements of any character, or in the construction, purchase, or condemnation of any public utility, or part thereof or facility therefor, which, either separately or in connection with any other public improvement or public utility, or part thereof, may reasonably be expected to yield revenue in excess of operating expenses sufficient to pay the interest and sinking-fund charges thereon, the city may, at any time and from time to time, present its petition to any of the courts of common pleas of the county in which such city is situated for the purpose of having determined the amount of its debt which may be deducted from its indebtedness in ascertaining the borrowing capacity of the said city as provided in section eight, article nine of the Constitution of the State of Pennsylvania, as amended."

Following the provisions of the Act of 1921 the petition contained a list of public improvements, public utilities and facilities therefor, which may reasonably be expected to yield such revenue, the amount of indebtedness which shall have been incurred or is about to be incurred for such public improvements as follows: (1) The water supply system; (2) the sewer system; (3) the Philadelphia gas works; (4) the Frankford elevated railway; (5) the Bustleton surface transit line; (6) the Frankford Avenue trackless trolley line and (7) the subway-surface extension.

This petition was made and sworn to by the Mayor of the City of Philadelphia and was attested to within matters of their special knowledge and control by the Controller of the City of Philadelphia, the director of public works, and the director of city transit. The petition on March 16, 1951, was filed by the city solicitor, pursuant to an authorization by resolution of the city

council, approved February 9, 1951. The petition was properly published, proofs thereof filed, and the matter came on for hearing before this court on petition and answer on April 13, 1951.

The answer, as filed by the city controller, raises no issue of law or fact as to items 1, 2, 3 and 4, supra, but as to items 5, 6 and 7 the city controller raises questions of law as to the excludability of the debt related to these facilities.

As to item 5, to wit, the Bustleton surface transit line, the city is the owner of this transit line and has incurred certain indebtedness, the proceeds of which are invested in the facilities as follows: Debt incurred and outstanding, January 1, 1951, $900,000. The petition alleges, subparagraph (c) of item 5, that "the average rate of interest and sinking fund charges and the debt costs for the year 1950, together with the estimated rate of interest and sinking fund charges and debt costs for each of the years 1951, 1952, 1953 and 1954, are set forth in Exhibit 5, attached hereto and made part of this petition".

Subparagraph (d) of item 5 in the petition states that:

"The said facilities are leased to and operated by the Philadelphia Transportation Company under an agreement dated August 1, 1947, under the terms of which the said company pays to the City an annual rental as therein set forth. A copy of the said agreement, marked Exhibit 5-A is attached hereto and made part of this petition."

Subparagraph (e) of item 5 states that:

"The City incurs no cost of operation in connection with the said facilities. The revenue received by the City from the said facilities for the year 1950, together with the estimated amount of such receipts for each of the years 1951, 1952, 1953 and 1954, is set forth in

Exhibit 5, attached hereto and made part of this petition."

Subparagraph (*f*) of item 5 states that:

"The said Bustleton Surface Line has yielded and may reasonably be expected to continue to yield revenue in excess of any operating expenses incurred by the City sufficient to pay the interest and sinking fund charges on the City indebtedness, the proceeds of which are invested in the said facilities."

In re item 6, to wit, the Frankford Avenue trackless trolley line, the petition avers:

(a) Pursuant to the authority vested in it by the Act of June 17, 1913, P. L. 520 (53 PS §3701, et seq.), the City of Philadelphia proposes to acquire certain trackless trolley vehicles to be leased to the Philadelphia Transportation Company for operation on Frankford Avenue between City Line and Bridge Street, referred to as the Frankford Avenue trackless trolley line.

(b) By ordinance of September 25, 1950, and approved by the electors at an election held on November 7, 1950, the city has authorized the creation of a loan of $1,000,000 (15-year straight serials) for the purpose, with a provision that this increase in the city's indebtedness shall not be valid and effective unless and until a decree of a court of competent jurisdiction shall have been entered authorizing the deduction of this proposed indebtedness in ascertaining the borrowing capacity of the City.

(c) The estimated annual rate of interest and sinking fund charges and the debt costs for each of the years 1951, 1952, 1953 and 1954 are set forth in exhibit 6.

(d) The facilities will be leased to and operated by the Philadelphia Transportation Company under an agreement dated March 1, 1951, under the terms of which the company will pay to the city an annual

rental as therein set forth. A copy of the said agreement is marked exhibit 6-A.

(e) The city will incur no cost in the operation of the facilities. The estimated revenue to be received by the city for each of the years 1951, 1952, 1953 and 1954 is set forth in exhibit 6.

(f) The facilities may reasonably be expected to yield revenue in excess of any operating expenses incurred by the city sufficient to pay the interest and sinking fund charges on the city's indebtedness, the proceeds of which are about to be invested in the facilities.

In re item 7, to wit, the subway-surface extension, the petition states:

(a) Pursuant to the authority vested in it by the Act of June 17, 1913, P. L. 520 (53 PS §3701 et seq.), the City of Philadelphia proposes to construct and equip certain underground facilities between a point at or near 36th and Ludlow Streets and a portal at or near 40th Street and Woodland Avenue, to be leased to the Philadelphia Transportation Company and to be used in operation of the subway-surface cars of that company, referred to as the "subway-surface extension".

(b) By ordinance of September 25, 1950, and approved by the electors at an election held on November 7, 1950, the City of Philadelphia has authorized the creation of a loan of $6,000,000 (50-year straight serials) for the purposes, with a provision that this increase in the city's indebtedness shall not be valid and effective unless and until a decree of a court of competent jurisdiction shall have been entered authorizing the deduction of this proposed indebtedness in ascertaining the borrowing capacity of the city.

(c) The estimated annual rate of interest and sinking fund charges and the debt costs for each of the years 1951, 1952, 1953 and 1954 are set forth in exhibit 7.

(d) The facilities will be leased to and operated by the Philadelphia Transportation Company under an agreement dated March 1, 1951, under the terms of which the company will pay to the city an annual rental as therein set forth. A copy of this agreement is marked 7-A.

(e) The city will incur no cost in the operation of the facilities. The estimated revenue to be received by the city for each of the years 1951, 1952, 1953 and 1954 is set forth in exhibit 7.

(f) The facilities may reasonably be expected to yield revenue in excess of any operating expenses incurred by the city sufficient to pay the interest and sinking fund charges on the city's indebtedness, the proceeds of which are about to be invested in the facilities.

The petition further avers that by decree dated February 15, 1949, in the Court of Common Pleas No. 3 of December term, 1948, no. 2510, the court authorized the exclusion of certain debt aggregating $203,-168,270, then invested and proposed to be invested in certain public improvements and utilities as therein set forth. Since the date of that decree, there have been changes in the amount of debt so invested and proposed to be invested by reason of maturities, calls and redemptions, authorizations and issues, and it is desirable that the amount of debt incurred and to be incurred and invested and about to be invested in these self-sustaining improvements and utilities be re-determined and decreed.

The petition therefore prays for an order of this court, carrying out the purposes of the petition, that the debt is incurred or about to be incurred by the City of Philadelphia, the proceeds whereof have been or are about to be invested in public improvements and in the construction, purchase, or condemnation of public utilities or parts thereof or facilities therefor, aggre-

gating in the sum of $201,228,584 to be expended in the various sums set forth in the petition alongside the various items therein enumerated.

The answer filed by the city controller raises no question of fact in relation to the Bustleton surface transit line, the Frankford Avenue trackless trolley line and the subway-surface extension; but it does raise questions of law as to the excludability of the debt related to these facilities as follows:

(a) As to *the Bustleton surface transit line, the Frankford Avenue trackless trolley line,* and *the subway-surface extension,* the petition sets forth no information from which it can be determined whether these facilities may reasonably be expected to yield from their operation net revenue in excess of operating expenses incurred by the lessee company sufficient to pay the charges on the debt sought to be excluded.

(b) As to *the Bustleton surface transit line, the Frankford Avenue trackless trolley line,* and *the subway-surface extension:* The lessee company and its subsidiaries operated at a loss in 1949 and 1950; there is no assurance that the future operation of the company will earn sufficient profit to meet its commitments to the city under its leases; that its consolidated balance sheets show reductions in the excess of current assets over current liabilities; that the assets of the lessee company, if it were unable to meet its debts as they mature, would yield no sum for general creditors in excess of its long-term mortgage debts.

(c) As to the *subway-surface extension:* That this facility will yield no new revenue to the city; that the rental provided for in the agreement of March 1, 1951, is based on an equivalent reduction of the rental from the Frankford elevated railway and the transfer of the amount of the reduction to the subway-surface extension; and that this transaction does not constitute

such revenue as will make the subway-surface extension self-sustaining.

An examination of section 8, art. IX of the Constitution of Pennsylvania, as amended November 2, 1920, after fixing the general debt limit of the City of Philadelphia at 10 percent of the assessed value of the taxable property therein, further provided:

"In ascertaining the borrowing capacity of the City of Philadelphia, at any time, there shall be deducted from such debt so much of the debt of said City as shall have been incurred, or is about to be incurred, and the proceeds thereof expended, or about to be expended, upon any public improvement, or in the construction, purchase, or condemnation of any public utility, or part thereof, or facility therefor, if such public improvements or public utility, or part thereof, whether separately or in connection with any other public improvement or public utility, or part thereof, may reasonably be expected to yield revenue in excess of operating expenses sufficient to pay the interest and sinking-fund charges thereon. The method of determining such amount, so to be deducted, may be prescribed by the General Assembly."

The method of determining such deduction is in fact prescribed by the Act of May 21, 1921, P. L. 1054, 53 PS §6757 et seq., which act describes in the terms of the constitutional provision what debt may be excluded. It therefore sets forth a procedure to secure such exclusion, which procedure has been followed by the city in the preparation of its petition.

An examination of the petition, with the exhibits thereto attached, shows that the debt sought to be excluded may be invested or proposed to be invested in a public utility or part thereof or facility therefor; that the operation may be an independent one, or in connection with any other public utility or part thereof; and that the basis of exclusion is a reasonable expecta-

tion that it will yield revenue in excess of operating expenses sufficient to pay the debt costs. It is further to be noted that the Constitution of Pennsylvania and the act of assembly, supra, relate to the debt of the city, and that the debt costs to be paid out of the net revenue are the debt costs which the city has to meet on this debt. It would also be seen that the Act of June 17, 1913, P. L. 520, 53 PS §3701 et seq., authorizes the city to purchase, lease, locate, construct, and equip or otherwise acquire transit facilities as defined by that act; and to own, maintain, use and operate the same with the right to sell, pledge or lease these facilities or any one or more of them to any corporation duly authorized and empowered to use and operate the same, and to enter into agreements for the construction or operation of any such facilities or any one or more of them by any such corporation, upon such terms and conditions as the council of the city shall determine. The construction and equipment of the Frankford elevated railway and the Bustleton surface transit line, the proposed acquisition and the leasing of the trackless trolley vehicles for the Frankford Avenue trackless trolley line, and the proposed construction and leasing of the subway-surface extension are pursuant to and in conformity with the provisions of the Act of June 17, 1913, P. L. 520.

In regard to the question of the city controller in the answer, as to whether the facilities and the operation of the various transit lines can be expected to yield a net revenue in excess of operating expenses incurred by the lessee company sufficient to pay the charge of the debt so as to be excluded, it appears to us that even if this were so it would not defeat the right of the city to the exclusion of a decree. The debt limitation in the Constitution of 1874 had for its purpose the protection of the taxpayers against burdensome tax rates to pay debt charges. This is explained in the case of Keller v.

Scranton, 200 Pa. 130, 134, 135. Since the adoption of the Constitution of 1874 there has been a tremendous expansion in the needs of the people and their demands upon their municipalities. The City of Philadelphia has grown in certain sections far beyond the dreams of the makers of the Constitution, and in order to meet the needs of the people living in these outlying sections, transit facilities must be provided for them. The furnishing of the needed improvements and utilities to the people of the enlarged Philadelphia without abating the protection of the Constitution against excessive taxation to meet the debt costs of the capital invested to supply these improvements and facilities now, is a problem of the present time. Thus, as amended in 1911, the Constitution shows that the debt limitation is no longer a limitation of the amount of debt which the municipality may incur, but is a limitation on the amount of debt the charges of which will be a burden on the taxpayer. Where the city obtains clear revenue in excess of operating expenses sufficient to pay the debt charges, no burden is imposed on the taxpayer, and the debt can be excluded in computing the general debt power of the city.

It will therefore be seen that the rental received by the city incurs no cost of operation in connection with the facilities and the whole of the amount received by it is available to pay debt charges. The fact that the lessee in its operation of the facility incurs operating costs and that these operating costs, together with the rental paid to the city, or without the rental paid to the city, are in excess of the revenue it receives from its operation, cannot alter the fact that the City of Philadelphia receives net revenue over and beyond any operating costs sufficient to pay the debt charges.

The test in determining whether the debt, the proceeds whereof have been or are about to be invested in public improvements, meets the requirements of the

Act of 1921 so that it may be deducted from the indebtedness in ascertaining the borrowing capacity of the city is whether the revenue which the improvement may reasonably be expected to yield to the city is in excess of the amount required to be paid by the city for operating expenses and interest and sinking fund charges. So long as the lease rental payable by the lessee to the city is in excess of the operating expenses, interest and sinking fund charges payable by the city, the requirements of the Act of 1921 are met. The fact that the revenues derived by the lessee from the operation of the improvement are less than the operating expenses of the lessee or less than the amount of the rental payable by the lessee to the City is immaterial.

This question was passed upon in the case of Greenhalgh v. Woolworth et al., 361 Pa. 543, 552. It must also be realized that the finances of the lessee company are not material in this matter since the rental payable to the city under the relevant lease is not payable out of the profits of the lessee company but it is a part of the operating expenses of the lessee which must be paid by it, or any one acting on its behalf, or any one succeeding to the operation as long as the facilities are used. We cannot conceive that there ever will come a time when there will not be operating transit lines of some kind or description in the City of Philadelphia. As long as they exist, their operating expenses will be paid to the City of Philadelphia, analogous to the payment of the salaries of employes and the most of materials. As has been argued, that even in the years of 1934 to 1940 when the Philadelphia Rapid Transit Company was reorganized, all the payments due to the City of Philadelphia under the then existing lease agreements were actually paid by the receiver. When the Philadelphia Transportation Company succeeded to the rights of the Philadelphia Rapid Transit Company, it became subject to the agreements of the city

and continued to pay the operating expenses. Unless the transit facilities of the city are entirely wiped out by some catastrophe, we have a reasonable right to expect that the revenues recited in the petition will be received by the City of Philadelphia sufficient to sustain the exclusion of the debt.

The answer of the controller avers that the rental of the subway-surface extension will yield no new revenue to the city since the rental is based on an equivalent reduction of the rental from the Frankford elevated railway, and the transfer of the amount of the reduction to the subway-surface extension; and that this transaction does not constitute such rental as to make the subway-surface extension self-sustaining. An examination of the Act of 1913 shows that it authorizes the city to construct transit facilities such as, inter alia, the Frankford elevated railway and the subway-surface extension, and to lease them to any corporation authorized to use or operate the same, upon such terms and conditions as the Council of the City of Philadelphia shall determine.

The City of Philadelphia entered into an agreement, pursuant to ordinance dated May 5, 1922, by which it leased the line to the Philadelphia Rapid Transit Company (predecessor to the Philadelphia Transportation Company) at a graduated annual rental which since 1927 has been five percent of the cost of constructing the facility and the improvements thereon. The lease became effective on November 5, 1922, and was to continue for a term of five years from that date, with a right of option on behalf of the city to renew and extend the term until July 1, 1957. This option was exercised by the city in accordance with the terms of the agreement. The rental received by the city for the year 1950 was $737,108, and the city incurred no cost of operation. The debt charges for that year were in the sum of $371,396. The initial outstanding debt has

been materially reduced so that the net revenue from the facility to the city is approximately twice the debt requirements on the remaining outstanding debt.

There was no question that under the Act of 1913, which gives the city the right to enter into a lease under such terms and conditions as the council of the city shall determine, also gives the city the right to extend, modify, or amend such lease upon the authorization of city council. The terms of modification or amendment are for the determination of City Council of Philadelphia, and if the city council acts upon this matter, such modification or amendment is not subject to attack.

The subway-surface lease agreement of March 1, 1951, was made in pursuance to an ordinance passed by the Council of the City of Philadelphia on March 1, 1951, and is a modification of a 1922 lease agreement with the Frankford elevated railway and authorizes a reduction in the rental payable for the Frankford elevated railway so that the lessee company will cease to operate transit vehicles on the street surface between Thirty-sixth and Ludlow Streets and Fortieth Street and Woodland Avenue, so that lessee will operate its vehicles and offer service through a subway tunnel to be constructed by the city. The lessee will continue its operation for 50 years, paying the City of Philadelphia an annual rental equivalent to the annual charges on the debt invested by the city in the subway-surface extension.

It cannot be questioned that council has the right and power for a renegotiation and modification of the rental for the Frankford elevated railway, even without relation to any subway-surface extension. If it possesses this authority, it must necessarily follow that the power of the City of Philadelphia to act is not diminished by reason of an agreement by which the City of Philadelphia obtains from the lessee company,

in addition to the advantages which would result from the substitution of underground for surface operation in a very congested area of the city, a rental sum equivalent to the amount of reduction of rental under the Frankford elevated railway agreement, which the city council had the right to do, and, subject to certain conditions, did do and modify.

It is our opinion that the City of Philadelphia had a right to negotiate an agreement for the leasing of the subway-surface extension. The mere fact that the rental by the lessee inures to it by reason of a portion of the rental saved under some other lease neither affects the validity of the subway-surface lease or the fact that the rental will be paid under its provision.

The agreement of March 1, 1951, provides that the lessee will pay to the city an annual rental which shall be an amount equal to the sums necessary to pay the charges or costs on the debt incurred by the city, the proceeds of which are to be invested in that utility. It appears that the amount of these annual debt costs or charges is estimated at approximately $250,000 a year. By the terms of this agreement it is provided that the Frankford elevated railway rental will be reduced by an equivalent amount, or approximately from $731,000, which rental was paid in the year 1950, to approximately $480,000. Thus according to these figures the city will receive a net revenue from the Frankford elevated railway of approximately $480,-000, to meet approximately $370,000 necessary for debt costs for this facility. At the same time the city will incur no costs in the operation of the facility.

We, therefore, believe that the agreement modifying the rental of the Frankford elevated railway and providing for the rental of the subway-surface extension is in accordance with the authority granted by law, and that the revenues to be received by the

city from each of these facilities will be sufficient to carry the respective debts, the proceeds of which will be and are invested therein. For these reasons the City of Philadelphia is entitled to the exclusion prayed for in its petition. We do not believe that the questions raised by the answer impair or defeat this right. We, therefore, enter the following order in accordance with the requirements of law:

### Order

And now, to wit, May 7, 1951, it is ordered and decreed that under and by virtue of the Act of May 21, 1921, P. L. 1054, and pursuant to the provisions of section 8, art. IX of the Constitution of Pennsylvania, the debt incurred or about to be incurred by the City of Philadelphia, the proceeds whereof have been or are about to be invested in any public improvement of any character or in the construction, purchase or condemnation of any public utility, or part thereof or facility therefor, aggregating $201,228,584 as follows:

```
The Water Supply System:
    Debt outstanding January 1, 1951....  $40,175,044
    Debt authorized and awaiting issue...  13,000,000
                                                        $53,175,044
The Sewer System:
    Debt outstanding January 1, 1951....  $98,980,477
    Debt authorized and awaiting issue...  27,000,000
                                                       $125,980,477
The Philadelphia Gas Works:
    Debt outstanding January 1, 1951....   $7,500,000
                                                         $7,500,000
The Frankford Elevated Railway:
    Debt outstanding January 1, 1951....   $6,373,063
    Debt authorized and awaiting issue...     300,000
                                                         $6,673,063
The Bustleton Surface Line:
    Debt outstanding January 1, 1951....     $900,000
                                                           $900,000
The Frankford Avenue Trackless Trolley Line:
    Debt conditionally authorized and
        awaiting issue ................   $1,000,000
                                                         $1,000,000
Subway-Surface Extension:
    Debt conditionally authorized and
        awaiting issue ................   $6,000,000
                                                         $6,000,000
```

may be deducted from its indebtedness in ascertaining the borrowing power of the city by reason of the fact that such public improvements and public utilities and parts thereof and facilities therefor are yielding and may reasonably be expected to yield revenue in excess of operating expenses sufficient to pay the interest and sinking fund charges thereon, and that the debt and proposed debt aggregating $201,228,584 be and the same is hereby wholly excluded in determining the power of the City of Philadelphia to incur debt.